IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SAVOY ENERGY, LLC,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>ASTON ENERGY, LLC,<br><br>Defendant.<br><br>_____<br><br><br>FERUS (PRICE) LP,<br><br>Plaintiff-Interpleader,<br><br>vs.<br><br>SAVOY ENERGY, LLC AND ASTON<br>ENERGY, LLC,<br><br>Defendant-Interpleader. | MEMORANDUM DECISION<br>AND ORDER<br><br><br><br>Case No. 2:16-CV-967<br><br>Judge Dee Benson |

This case involves a contractual dispute among three parties: Savoy Energy, LLC

("Savoy"), Aston Energy, LLC ("Aston"), and Ferus (Price) LP ("Ferus").[1]  The dispute relates

to the sale and transportation of carbon dioxide ("CO2") gas from Savoy's wells to Ferus's plant

through Aston's pipeline (the "Aston Pipeline").  The initial Complaint was filed by Savoy,

seeking to recover unpaid amounts under the contract between Savoy and Aston.  Aston's

Answer and responsive pleading included numerous counterclaims against both Savoy and

Ferus.

The matter is presently before the court on two motions filed by Ferus, joined by Savoy,

seeking summary judgment on all of Aston's counterclaims.  (Dkts. 47, 48, 57, 58.)  At oral

argument on the motions, Ferus was represented by Karen Spaulding and Michael Cross.  Savoy

was represented by Shawn Welch.  Aston was represented by Benjamin Wegener and Lorne

Hiller.  At the conclusion of the hearing, the court took the matter under advisement.  Now,

having carefully considered the written memoranda and oral arguments of the parties, as well as

the relevant law and facts relating to the motions, the court renders the following Memorandum

Decision and Order

## BACKGROUND

### The Parties

Savoy operates two CO2 reservoir wells and is the "unit operator" of the Clark Valley

Unit pursuant to a March 12, 2007 Unit Agreement issued by the United States Department of

---

[1]The original agreement was entered into with Ferus's predecessor, Pure CO2, LLC.  On July 28, 2011, Pure CO2 was purchased by an indirect subsidiary of Ferus LP, and Pure LLC converted to a limited partnership and was renamed Pure CO2, LP.  For purposes of deciding the motions now before the court, the entities Pure CO2, LLC, Pure CO2 LP and Ferus (Price) will be referred to as "Ferus."

the Interior Bureau of Land Management ("BLM").  (Dkt. 47-2.)  On June 19, 2007, the BLM

issued Savoy a right-of-way permitting the construction and operation of a CO2 feedstock gas

pipeline to connect Savoy's wells to a CO2 liquefaction plant owned and operated by Ferus.

From 2007 to 2016, Savoy, Aston and Ferus engaged in a business venture wherein

Savoy operated the CO2 reservoir wells that produced raw CO2 feedstock gas, Aston transported

the gas through its pipeline (the "Aston Pipeline") contained within Savoy's right-of-way, to

Ferus's liquefaction plant where Ferus would process the feedstock gas for the subsequent sale

of liquefied CO2.  To facilitate this business venture, Aston and Savoy entered into a "Purchase

Agreement," effective September 3, 2007, pursuant to which Aston purchased CO2 feedstock

gas from Savoy.  (Dkt. 47-4, Purchase Agreement.)  Aston and Ferus entered into a similar Sell

Agreement, also effective September 3, 2007, pursuant to which Aston sold CO2 gas to Ferus.

(Dkt. 47-5, Sell Agreement.)  In sum, the Purchase Agreement and Sell Agreement together

formed a buy-sell arrangement whereby Savoy sold CO2 to Aston and then Aston sold the CO2

to Ferus.

After the 2007 Purchase Agreement and Sell Agreement were executed, Aston began

purchasing CO2 from Savoy, transporting it through the Aston Pipeline, and then selling it to

Ferus at the contractually agreed upon rates.  However, the Agreements were re-negotiated

occasionally to address a variety of issues including but not limited to pricing, CO2 availability,

and shortfall payments.  As a result, the Sell Agreement (between Aston and Ferus) had

"Contract Change" amendments dated March 18, 2008 and December 10, 2010.  (Dkt. 2-2.)  The

Purchase Agreement (between Aston and Savoy) had "Contract Change" amendments dated

September 26, 2007, March 18, 2008, December 21, 2010, December 27, 2010, and December 15, 2015. (*See* Dkt. 2-1.)

The Relevant Contract Provisions

The following contract provisions and "Contract Change" agreements are relevant to the motions now before the court.

The March 18, 2008 Contract Change to the Sell Agreement between Aston and Ferus amended Section 2 of the Sell Agreement by setting forth a $1.00 per ton penalty payment should Ferus not purchase the agreed upon 106,500 tons of crude $CO_2$ annually (the "Shortfall Payment"). (Dkt. 47-5.) Section 2 of the March 18, 2008 Contract Change states: "It is anticipated that [Ferus] will purchase 300 tons per day. In the event that [Ferus] does not purchase such volume, then a penalty for taking less than 300 tons will be assessed to [Ferus] of $1.00 per ton up to a maximum penalty of $106,500. Such penalty will be reduced proportional by the number of tons taken and used in production and or finished product." (*Id.* at 9.)

The December 21, 2010 Contract Change to the Sell Agreement amended section 3.4, stating: "The Base Price [for $CO_2$ gas] shall remain at eight dollars ($8.00) per ton until October 1, 2012, at which time the price shall be increased to nine dollars ($9.00) per ton until October 1, 2016." (Dkt. 47-5 at 11, ¶3.4.) Although the December 21, 2010 Contract Change increased the base price for $CO_2$ from October 1, 2012 until October 1, 2016, it did not modify the $1.00 per ton Shortfall Payment.

The December 21, 2010 Contract Change to the Sell Agreement also amended section 2.5 to provide that the Sell Agreement may be terminated on October 1, 2016 with three to six

months prior written notice, and in the absence of a termination notice, the term would automatically renew for additional one-year terms. (Dkt. 47-5 at 11, § 2.5.)

The Purchase Agreement between Aston and Savoy, also amended by a Contract Change dated December 21, 2010, contained the same termination language as the Sell Agreement, providing in section 2.5 that it may be terminated on October 1, 2016, with identical notice and automatic renewal provisions as the Sell Agreement. (Dkt. 47-4 at 10, Purchase Agreement Contract Change § 2.5.)

Finally, the Purchase Agreement between Aston and Savoy provided Aston with a Right of First Refusal (ROFR) to build and operate future pipelines within Savoy's Clark Valley Unit. (Dkt. 47-4 at 5, Purchase Agreement § 8.3.) Section 8.3 of the Purchase Agreement states:

> [Aston] shall have first right of refusal to own, construct and operate all future pipelines within Savoy Energy's area if [sic: of] participation within the CLARK VALLEY UNIT, and tie in the CO2 wells, with a gathering and transportation fee to be negotiated at a time prior to construction of any future pipelines. In the event [Aston] elects not to construct, own and operate a portion of the pipeline and Savoy proceeds to drill and construct its own gathering line, [Aston] shall allow Savoy to tie that pipeline in to the main transportation line from the field to [Ferus'] plant. Savoy will pay its share of the exact operations and maintenance costs for that gas, transported in that pipeline, that is not gathered by [Aston]. The exact operations and maintenance costs shall be based upon generally accepted pipeline operations practices in the carbon dioxide industry.

(*Id.*)

Chronology of Events Leading to Lawsuit

In December 2015, Ferus entered into discussions with Praxair regarding the potential sale of Ferus's plant to Praxair. On December 7, 2015, Ferus officially notified Aston in writing about the potential sale. To further facilitate the process, on February 27, 2016, Ferus initiated

discussions with Savoy and Aston to negotiate commercial terms that would govern long-term certainty of feedstock gas transportation over the Aston Pipeline after October 1, 2016 – the date the Sell Agreement and Purchase Agreement were set to expire.  (Dkt. No. 47-7, Email dated 2/27/16.)

On April 18, 2016, Ferus made an initial offer to purchase the Aston Pipeline for $800,000.  The offer was subject to several conditions, including: (1) a "dollar-for-dollar" price adjustment for any required maintenance or critical upgrades "reasonably required for the safe and prudent operation of the pipeline," as determined by an independent third-party inspector; and (2) Aston's delivery of "ownership documents, maintenance records, [and the] original construction agreement with Savoy," with reasonable efforts to obtain "any missing pipeline registration or permits with the BLM or other governing authority."  (Dkt. 47-8, Email dated 4/18/16.)

On April 21, 2016, Aston made a counteroffer to sell the Aston Pipeline for $1,200,000. The counteroffer specified that Aston would provide any information in Aston's possession regarding permits or registration, but "Aston [would] not represent and warrant compliance with BLM and other government regulations."  Aston explained: "Because Savoy holds title to the BLM right of way, we believe that Savoy may need to provide additional information to BLM to cure any gaps in BLM maintained information."  (Dkt. 47-9, Email dated 4/21/2016.)

While these negotiations were underway, on April 23, 2016, the Aston Pipeline suffered a rupture causing a temporary shutdown.  The rupture was believed to have been due to corrosion of one of the flexpipe system's coupling joints, causing a portion of the pipeline to

burst above ground level.  (Dkt. 47-11, Letter dated 5/12/2016.)

Following the rupture, on April 26, 2016, Ferus emailed Aston requesting "documentation outlining actions taken to repair the pipeline, the root cause analysis of the failure, and any regulatory approvals, review or reporting undertaken or that needs to be completed."  (Dkt. 47-10, Email dated 4/26.2016.)  Ferus further stated, "[w]e will require adequate assurances about the integrity of the pipeline and the proper reporting of the event to the governing authorities before we continue our purchase discussions."  (*Id.*)

Aston responded the following day with "pressure test data" indicating that the line would hold pressure, but did not provide anything further.  Consequently, on April 28 and May 3, Ferus made additional requests that Aston provide information "detailing the root cause of failure and a description of the activities that will be undertaken to rectify the root cause and verify that the issues do not exist elsewhere on the system."  (Dkt. 47-13, Email dated 4/28/2016; *id.*, Email dated 5/3/2016 ("when can we expect to receive a report detailing the root cause of failure and the actions taken to resolve the identified cause?").)  On May 12, Ferus made another request for information, expressing "concern[] regarding the adequacy of Aston's investigation into the root cause of the failure," as well as "concern[] about the Pipeline being operated under customary operating conditions."  (Dkt. 47-11, Letter dated 5/12 /2016.)  Ferus informed Aston that in light of these concerns, Ferus had suspended plant operations.  Aside from the pressure test, Aston failed to provide Ferus or Savoy with any information indicating that the root cause of the pipeline rupture had been resolved.

Shawcor, the manufacturer of the Aston Pipeline Flexpipe components, evaluated the

ruptured portion of the pipeline and determined that it had extensive corrosion in certain areas and did not have necessary protective covering. (Dkt. 47-15, Shawcor Product Engineering Report.) Shawcor engineers also informed Aston that the pipeline did not have o-rings on the fittings, making it likely that gas could pass through the fitting surface and create acids that would degrade unprotected fittings. (Dkt. 47-16, Letter dated 5/6/2016 from Shawcor to Aston.)

On June 20, 2016, having concerns that the Aston Pipeline was not adequate to ensure long-term CO2 transportation to Ferus's plant, Ferus provided Aston with formal written notice that it was exercising its right to terminate the Sell Agreement effective October 1, 2016, pursuant to Section 2.5 of the Sell Agreement. (Dkt. 47-18.)

That same day, June 20, 2016, Savoy similarly provided Aston with formal written notice that it was exercising its right to terminate the Purchase Agreement effective October 1, 2016, pursuant to Section 2.5 of the Purchase Agreement. (Dkt. 47-19.) In addition, Savoy provided Aston a notice regarding Aston's Right of First Refusal under section 8.3 of the Purchase Agreement. The notice purported to provide Aston "with sufficient disclosure to enable Aston to exercise its election under Section 8.3 of the [Purchase] Agreement ("ROFR") to own, construct and operate a new CO2 feedstock pipeline in the Clark Valley Unit." (Dkt. 47-20.) Savoy informed Aston that Ferus had proposed to construct a new pipeline on Savoy's right-of-way, and instructed that "Aston may elect to exercise the ROFR . . . on substantially the same terms and conditions as the [Ferus] proposal." (*Id.*)

On June 29, 2016, Aston responded to Savoy's ROFR Notice with a request for additional information about the need for a new pipeline, "including a description of how the

contemplated new pipeline will provide services different from those currently provided by Aston's existing pipeline."  (Dkt. 47-21.)

That same day, June 29, 2016, Aston also sent a letter to Ferus, accusing Ferus of breaching the Sell Agreement for "failure to pay [the shortfall] fee of $2.00/ton for failure to purchase a minimum of 300 tons per day" after October 1, 2012.  (Dkt. 47-21.)

On July 6, 2016, Ferus responded by letter to Aston's accusation that it was in breach of section 2 of the Sell Agreement.  Ferus attached to its letter the March 18, 2008 Contract Change which set forth the $1.00/ton Shortfall Payment, and Ferus further explained its position as follows:

> In Aston's monthly invoices from November 2012 onward, Aston unilaterally commenced to charge [Ferus] $2/ton committed to but not taken.
>
> In October 2013, [Ferus] discovered this invoice discrepancy and raised the matter with Mr. Fowles, who claimed that our obligation to pay $2/ton pursuant to the Shortfall Obligation was a contractual obligation.  At that time, [Ferus] made several requests to Mr. Fowles to produce evidence demonstrating that the Shortfall Obligation rate was amended from $1/ton to $2/ton after March 18, 2008.
>
> To date, Aston has not provided [Ferus] with evidence that the Shortfall Obligation rate should be $2/ton and continues to deliver monthly invoices reflecting that rate.  In paying each invoice, [Ferus] has hand-marked the invoice to amend the $2 to $1 per ton, in accordance with Section 2 of the Sell Agreement.  In total, [Ferus] pays $9/ton taken by the CO2 plant pursuant to the Base Price in Section 3.4, as amended by the contract changed dated December 21, 2010, plus $1/ton for each ton committed but not taken pursuant to the Shortfall Obligation.
>
> If Aston has the evidence showing that [Ferus] should pay a higher rate, we request that the evidence be immediately disclosed to [Ferus] for review.

(Dkt. 47-22.)

Ferus also addressed the need for a new pipeline, explaining that due to Aston's "lack of timely ... and transparent disclosure about the condition and integrity of the Aston Pipeline, [Ferus] has had to pursue alternative strategies to protect its business interest, and to prevent any erosion of commercial value to the CO2 plant due to uncertainties about the safety and reliability of the current pipeline system." (*Id.*)

That same day, July 6, 2016, Savoy also responded to Aston's June 29 request for additional information about the need for a new pipeline. Savoy explained that under the terms of Savoy's right-of-way, issued by the BLM, Savoy must ensure that "all design, material and construction, operation, maintenance and termination practices shall be in accordance with safe and proven engineering practices." (Dkt. 47-23.) Savoy detailed a number of safety and operational concerns regarding the Aston Pipeline and explained that, based on those concerns, it had determined that the continued use of the existing pipeline "would violate Savoy's [right-of-way] covenants." (*Id.*) Savoy acknowledged that the new pipeline, proposed by Ferus, would provide similar services as the Aston Pipeline, but explained that the proposed design of the new pipeline would meet Code requirements, have a pressure rating of ANSI 600 (1500 psi),[2] be uniformly constructed from 4-inch flexpipe, and "deliver the gas transportation services with significantly fewer safety risks and provide greater operational reliability." (*Id.*)

On August 1, 2016, Aston sent its formal response to Savoy's June 20, 2016 Right of First Refusal Notice. (Dkt. 47-24, Letter dated 8/1/16.) Aston's response states: "Aston elects to exercise the ROFR by utilizing its existing pipeline, which is more than adequate to meet the

_____

[2]Compared to the Aston Pipeline's ANSI 300 (750 psi). (Dkt. 47-23 at 2.)

CO2 transportation requirements of the Clark Valley Unit and is in material compliance with state and federal regulations." (*Id.*) Aston then opined that, contrary to Savoy's suggestion, Aston was not required under the ROFR to agree to construct a new pipeline on identical terms to those proposed by Ferus. Instead, according to Aston, "[a]ll that Section 8.3 of the [Purchase] Agreement requires is entry into a reasonable agreement for future pipeline services." (Dkt. 47-24.)

On August 4, 2016, Savoy responded, claiming that Aston's letter was "not a valid exercise of the ROFR under section 8.3 of the Purchase Agreement" and, "having failed to validly exercise the ROFR, Savoy will proceed with its plans to own, construct and operate the new CO2 feedstock pipeline in the Clark Valley Unit." (Dkt. 47-25.)

In preparation for the construction of the new pipeline, Elkhorn Pipeline Services – the contractor hired to build the new pipeline – submitted a Blue Stakes of Utah "one call ticket locate request," asking Aston to "locate" its pipeline in Savoy's right-of-way. (Dkt. 57-11.) Aston received the request on August 17, 2016. However, despite receiving the request, Aston did not respond to the request and did not "locate" the pipeline because, according to Aston, it did not think there was any current construction activity. (Dkt. 57-12.)

On September 8, 2016, the BLM approved an amendment to Savoy's right-of-way, authorizing the construction of a new pipeline with the understanding that the existing Aston Pipeline "would be abandoned in place." (Dkt. 47-14, Dep't of Interior BLM Decision.) In the approval, the BLM noted that "[f]ield maximum operating pressures (850 psi shut in pressure) and conditions exceed the engineered limits of the existing pipeline which is ANSI 300 with an

operating pressure of 750 psi." (*Id.*)  Additionally, the BLM noted that the Aston Pipeline "has suffered corrosion on pipeline couplings, resulting in one known failure.  "The existing line is composed of 3" and 4" line which has created liquefaction issues within the line resulting in off spec operating methods required to bring the line on and off during operation and supply of product to the plant."  (*Id.*)

Ferus began construction of the new pipeline on September 12, 2016 and substantially completed construction around September 30, 2016.  During construction of the new pipeline, the Aston Pipeline was capped, damaged and rendered inoperable. (Dkt. 29, Answer & Am. Counterclaims, ¶¶ 29-31.)

On August 26, 2016, Savoy filed suit against Aston for unpaid amounts under the Purchase Agreement.[3]  Aston responded with counterclaims against both Savoy and Ferus, the majority of which relate to Aston's claim (1) that it validly exercised its Right of First Refusal under the Purchase Agreement and (2) that Ferus failed to pay shortfall penalties under the Sell Agreement.  In the motions now before the court, Ferus and Savoy move for summary judgment on all of Aston's counterclaims.

## DISCUSSION

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); *see Anderson v. Libberty Lobby,*

---

[3]The merits of Savoy's claim for unpaid invoices is not presently before the Court, and that dispute is not directly relevant to the pending motions for summary judgment.

*Inc.*, 477 U.S. 242, 250-51 (1986).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

However, not every issue of fact or conflicting inference presents a genuine issue of material fact. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252; *see also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999).  Finally, conclusory allegations without supporting evidence, do not raise a genuine issues of material fact, especially in light of other evidence in the record.  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1178 (10th Cir. 2006); *see Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004) ("Unsupported conclusory allegations . . . do not create a genuine issue of fact."); *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994) (providing that "allegations alone will not defeat summary judgment").

## I.        The Right of First Refusal (ROFR) in the Purchase Agreement

Aston's First, Second, Third and Seventh Counterclaims allege that Savoy and Ferus prevented Aston from being able to exercise its ROFR and therefore prevented Aston's continued operation of the Aston Pipeline.[4]  Having reviewed the allegations and evidence

---

[4]Aston's counterclaims relating to the ROFR include: (1) Breach of Contract; (2) Declaratory Judgment; (3) Injunctive Relief; and (7) Conspiracy.  (Dkt. 29, Answer & Am. Counterclaims.)

presented to the court, and considering the relevant law, the court concludes as a matter of law

that the ROFR is an unenforceable "agreement to agree," and even if it were enforceable, no

reasonable juror could conclude that Aston properly exercised the ROFR.

A.    The ROFR in the Purchase Agreement is an Unenforceable
      Agreement to Agree

Section 8.3 of the Purchase Agreement between Savoy and Aston provides in pertinent

part that "Aston shall have first right of refusal to own, construct and operate all future pipelines

. . . with a gathering and transportation fee to be negotiated at a time prior to construction of any

future pipelines."  (Dkt. 47-4 at 5, Purchase Agreement.)  Notably, Section 8.3 provides that

Aston's opportunity to "construct and operate" future pipelines is dependent on the requirement

that the parties negotiate a "gathering and transportation fee . . . prior to construction of any

future pipelines."  (*Id.*)

Under Utah law, in order for a contract to be enforceable, the obligations of the parties

must be set forth with definite terms and conditions.  *Brown's Shoe Fit Co. v. Olch* , 955 P.2d

357,  363 (Utah App. 1998).  The Supreme Court has explained: "Courts simply are not equipped

to make monetary decisions impacted by the fluctuating commercial world and are even less

prepared to impose paternalistic agreements on litigants."  *Cottonwood Mall Co. v. Sine*, 767

P.2d 499, 502 (Utah 1988).  Accordingly, the failure to specify obligations regarding time frames

or pay rates renders extensions or future options too vague to be enforceable.  *Id.* at 502;

*Brown's Shoe Fit*, 955 P.2d at 363-64.

Simply put, Section 8.3 of the Purchase Agreement fails to include specific terms on

essential elements of a future agreement; specifically, the price and the term to be included in

any new transportation agreement.[5]  As a result, the Court finds, as a matter of law, that the ROFR in Section 8.3 is an unenforceable agreement to agree.

## B. Even if Enforceable, Aston Failed to Properly Exercise the ROFR

Even assuming *arguendo* that Section 8.3 of the Purchase Agreement was an enforceable contract provision, no reasonable juror could conclude that Aston's responsive offer was a proper exercise of the ROFR or that Savoy's rejection of Aston's offer was unreasonable.

Under Utah law, a party burdened with a ROFR, such as Savoy in this case, must (1) provide the holder of the ROFR with notice of a third party offer and its intention to accept the third party offer; (2) allow the ROFR holder an opportunity to submit a competing offer; and (3) reject the holder's offer, if any, only on the basis of reasonable justification.  *Prince v. Elm Inv. Co.* 649 P.2d 820, 826 (Utah 1982); *see also Weber Meadow-View Corp. v. Wilde*, 575 P.2d 1053, 1055 (Utah 1987) (a ROFR only provides the optionee the right to purchase upon the seller's terms as long as done in good faith).

As explained in detail above, on June 20, 2016, Savoy sent a ROFR Notice to Aston, stating that Ferus had offered to construct a new pipeline on Savoy's right-of-way, and provided Aston with an opportunity to exercise the ROFR by constructing a new pipeline with the same specifications as the proposed new pipeline.  (Dkt. 47-20, June 20 ROFR Notice.)  Savoy's

_____

[5]The various allegations and claims in this lawsuit demonstrate precisely how significant and complicated the contractual items of "price" and "term" are in this context.  As the facts demonstrate, even in instances where the parties expressly negotiated and agreed on a particular price and then reduced that agreement to writing, the parties continue to dispute those express contractual terms.  (*See e.g.*, Dkt. 2-1 at 3 (Savoy's claim for unpaid invoices under the Purchase Agreement) and Dkt. 29 at 19 (Aston's counterclaim for Shortfall Payments under the Sell Agreement).)

Notice to Aston provided the specifications of Ferus's proposed pipeline and the material terms of Ferus's offer, including: adherence to all applicable Code, safety requirements and government regulations; ANSI 600 Piping (1,500 psi rated); external corrosion protection for all connection, coupling and transitions; and evidence of creditworthiness to fund construction of the pipeline. (Dkt. 47-20.)

Then on July 6, 2016, Savoy responded to Aston's request to "explain the need for a new pipeline . . . includ[ing] a description of how the New Pipeline will provide services that are different than those currently provided by the Aston Pipeline." (Dkt. 47-23.) Savoy obliged, explaining that it had "considered several safety and operational concerns" and determined that "continued use of the existing Aston Pipeline would violate Savoy's [right-of-way] covenants." (*Id.*) Savoy provided Aston with significant detail regarding concerns over inadequate operating pressure, corrosion, equipment and safety code violations, and then summarized these concerns as follows:

> The New Pipeline proposed by [Ferus] will provide similar services as the Aston Pipeline. However, the proposed design of the New Pipeline will meet Code requirements, have a pressure rating of ANSI 600 (1500 psi), be uniformly constructed from 4-inch flex pipe, and . . . stand to deliver the gas transportation services with significantly fewer safety risks and provide greater operational reliability.

(Dkt. 47-23.)

Although the evaluation of competing offers is typically a question of fact, *see Prince v. Elm Investment Co.,* 649 P.2d 820 (Utah 1982), the court concludes that given the facts in this case, no reasonable juror could conclude that Aston's response was a proper exercise of the ROFR. First, the Purchase Agreement does not permit the exercise of the ROFR by using the

existing pipeline; rather the ROFR offers the "right" to "build future pipelines." Section 8.3 explicitly states that Aston shall have the right of first refusal to own, *construct and operate all future* pipelines. (Dkt. 47-4 at 5, *emphasis added*.) Given this contractual language, Aston's decision to exercise the ROFR by using the existing Aston Pipeline was no offer at all.

Second, Savoy proceeded in a manner consistent with the requirements of Utah law. Savoy notified Aston of Ferus's offer to build a new pipeline, Savoy provided Aston with an opportunity to submit a competing offer, and, to the extent Aston's offer to use the existing pipeline can be construed as an offer, Savoy provided a reasoned explanation of why continued use of the existing Aston Pipeline was materially inferior to Ferus's proposed new pipeline. Therefore, the court concludes that even if Section 8.3 of the Purchase Agreement were a valid and enforceable contract provision, Aston failed to properly exercise the ROFR.

Accordingly, the court grants Savoy and Ferus's motions for summary judgment on Aston's First, Second, Third and Seventh Counterclaims arising from the ROFR contained in the Purchase Agreement.

## II.     The Shortfall Payment in the Sell Agreement

Aston's Fourth Counterclaim alleges that Ferus breached the Sell Agreement by failing to pay a $2.00 per ton Shortfall Penalty. Specifically, Aston alleges that "[p]ursuant to a subsequent agreement of the parties, the . . . Sell Agreement was thereafter modified to reflect that in the event that [Ferus] did not purchase 300 tons of raw carbon dioxide gas per day, then [Ferus] would be assessed a penalty in the amount of $2.00 per ton." (Dkt. 29, Am. Counterclaim, ¶ 13.) However, Aston has failed to provide the Court with any written

instrument, correspondence, or any piece of evidence to support its claim that Ferus and Aston modified the Sell Agreement to change the Shortfall Payment from $1.00/ton to $2.00/ton.

When interpreting a contract, courts first "look to the language of the document to determine its meaning and the intent of the contracting parties[.] Where 'the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 210 P.3d 263, 267 (Utah 2009). In this case, the language in the March 2008 Contract Change to the Sell Agreement is unambiguous and provides for a Shortfall Payment of $1.00 per ton. Although the Sell Agreement was subsequently amended in December 2010 (changing the base price of $CO_2$ from $8.00 per ton to $9.00 per ton), there is nothing in the December 2010 Contract Change to modify the $1.00 per ton Shortfall Payment.

Aston's argument that there was an "implied" agreement between Aston and Ferus to increase the Shortfall Payment to $2.00 per ton is not supported by any evidence in the record and is actually contradicted by it. In the July 6, 2016 letter from Ferus to Aston, Ferus details the course of conduct between the parties regarding the Shortfall Payment. Ferus explains that in October 2013, upon realizing that approximately one year earlier Aston had unilaterally started charging Ferus a Shortfall Penalty of $2.00 rather than $1.00 per ton, Ferus requested evidence to support the $2.00 Shortfall Penalty. In October 2013, Ferus also began hand-marking the invoices from Aston to amend the Shortfall Payment "from $2 to $1 per ton in accordance with Section 2 of the Sell Agreement." (Dkt. 47-22.)

Because Aston has failed to provide any evidence to support its claim that the Shortfall Payment in the Sell Agreement was modified by the parties to $2.00 ton, the court grants Savoy and Ferus's motion for summary judgment on Aston's Fourth Counterclaim.

### III.     The Economic Loss Rule

Finally, the Court concludes that Aston cannot prevail on its tort-based counterclaims of "tresspass to chattel" and "conversion" – Aston's Fifth and Sixth Counterclaims – because those claims are barred by the economic loss rule.

"The economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care." *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 28 P.3d 669, 680 (Utah 2001). This doctrine exists to prevent recovery of economic damages under tort principles "when a contract covers the subject matter of the dispute." *Reighard v. Yates*, 285 P.3d 1168, 1176 (Utah 2012). Accordingly, when parties enter into a contract, a breach of any duty related to that contract "must be enforced pursuant to contract law." *Id.* at 1177.

Aston argues that the economic loss rule does not apply in this case because the damage to the Aston Pipeline constitutes damage to "other property" – property that is outside the scope of the contracts between the parties and therefore unaffected by the contract bargain. (Dkt. 63 at 8 & 12.) The Court disagrees. Both the Purchase Agreement and the Sell Agreement cover the subject matter at issue in Aston's tort claims – damage to the Aston Pipeline and construction of

a new pipeline on Savoy's right of way.

The Purchase and Sell Agreements cover the transportation of $CO_2$ through the Aston Pipeline on Savoy's right of way, and include indemnification provisions related to "prudent operations," as defined by the generally accepted industry practices and procedures. (Dkt. 57 at 11-12.) For example, Section 7.2 of the Purchase Agreement provides in full: "Aston shall save, hold harmless and indemnify [Savoy] from and against all claims, damages, injuries, losses, liability or litigation arising out of or resulting from [Savoy's] prudent operations, as defined by the industries [sic] generally accepted operating practices and procedures, on [Savoy's] right of ways and pipeline right of ways."[6] (Dkt. 2-2, Purchase Agreement, Section 7.2; *see also* Dkt. 47-4, Sell Agreement, Section 7.2.)

Accordingly, the court concludes that the relationship among Ferus, Aston and Savoy is governed by the Purchase Agreement and Sell Agreement, and those contracts are the exclusive means of obtaining economic recovery on Aston's claims. Because Aston has failed to carry its burden to show an exception to the economic loss doctrine sufficient to allow its tort claims to continue, the court grants summary judgment on Aston's Fifth and Sixth Counterclaims.

## CONCLUSION

For the reasons set forth above, the court rules as follows: Ferus L.P.'s Motion for Partial Summary Judgment (Dkt. 47) is GRANTED; Savoy's Motion for Partial Summary Judgment (Dkt. 48) is GRANTED; Ferus L.P.'s Motion for Partial Summary Judgment on Aston

---

[6]To the extent Aston complains of Savoy's compliance with the BLM mandate that the existing Aston Pipeline be capped and abandoned in place, it appears to be contemplated by the indemnity provision's inclusion of "generally accepted operating practices and procedures" in the industry.

Energy's Fifth and Sixth Counterclaims (Dkt. 57) is GRANTED; and Savoy's Motion for Partial

Summary Judgment on Aston Energy's Fifth and Sixth Counterclaims (Dkt. 58) is GRANTED.

DATED this 10th day of April, 2018.

_____
Dee Benson
United States District Judge